SIGNED.

Dated: June 11, 2012

James M. Marlar, Chief Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF ARIZONA

| In re: | Chapter 7 |
|---|---|
| PATRICK A BECK AND PRISCILLA J BECK, | No. 4:11-bk-06633-JMM |
| | Adversary No. 4:11-ap-00709-JMM |
| Debtors. | **MEMORANDUM DECISION** |
| JAVIER CAMPOS, | |
| Plaintiff, | |
| v. | |
| PATRICK A BECK AND PRISCILLA J BECK, | |
| Defendants. | |

On May 8, 2012, proceedings were held on Plaintiff's complaint to determine the dischargeability of a debt. After presentation of the evidence, and after having had the matter under advisement, the court now rules.

**<u>JURISDICTION</u>**

This court has jurisdiction over this core proceeding. 28 U.S.C. §§ 1334 and 157(b)(2)(I).

## ISSUES

1. Do Defendants owe Plaintiff a debt?

2. If so, is it non-dischargeable under 11 U.S.C. § 523(a)(2) and/or (6)?

3. What damages, if any, has Plaintiff proven?

## FACTS

1. The Defendants are husband and wife and were the sole equity owners of an LLC entity doing business as a car dealership in Nogales, Arizona, and that the LLC dealership sold a car to the Plaintiff. (Agreed Fact.)

2. On March 7, 2009, Plaintiff Javier G. Camps, purchased a 2009 Dodge Ram truck from the Pat Beck Chrysler Dealership (the "Dealership") (Ex. 7). The total sales price, including taxes, license and fees, was $29,053 (Ex. 7). That amount was to be paid by a credit of $19,000 for a trade-in of the Mr. Campos' 2006 Lincoln Zephyr (or from a resultant financing agreement), a $1,000 cash deposit and $5,524 in rebates.

3. From the cash trade-in and rebates, the Dealership was to remit the payoff due to Bank of the West (the "Bank"), which held a lien on Mr. Campos' Lincoln of approximately $20,750 (Ex. 7).

4. Plaintiff obtained a new loan, and pursuant to the contract agreement, with the funds from the new loan, the Dealership was to pay-off loan #163608336 to the Bank in the amount of $20,966.05, which was the outstanding loan for the traded-in vehicle (Ex. 9).

5. The Dealership received the monies from the new loan for the pay-off, but kept the money and never paid off the original loan to the Bank.

6. On April 28, 2009, the Dealership sent a check to the Bank for the sum of $20,966.05, which was later returned for insufficient funds. The check was signed by Elena Corona, the office manager, an authorized agent for the Dealership (Ex. 1).

7. On May 13, 2009, the Bank advised Mr. Campos that the Dealership's $20,966.05 check had been returned due to "insufficient funds," and that Mr. Campos was still liable on his debt to it (Ex. 2).

8. At that point, Mr. Campos returned to the Dealership to ascertain what had occurred, and was advised by the sales manager that payment to the Bank was "no problem" Mr. Campos testified that he also spoke with Pat Beck, personally, who advised him that there was "no problem, and this will be taken care of."

9. Thereafter, Mr. Beck individually signed, on behalf f the Dealership, a dummy check, allegedly to pay off Mr. Campos' loan to the Bank, for $20,053.16 (Ex. 3). A copy of this check was given to Mr. Campos, in order to placate him into thinking that his loan to the Bank was being appropriately paid off, but this check was never sent out (Ex. 3). Mr. Beck personally was a part of this fraudulent scheme.

10. Mr. Beck testified that, at the time he signed this dummy check, the company was having cash flow problems, and that Ex. 3 "probably wasn't any good," and that was why it was not sent to the Bank. He had done the same with 3-4 other customers at about the same time.

11. Mr. Beck knew or directed others to show Mr. Campos a copy of Ex. 3 (the dummy check) in order to deceive Mr. Campos into believing that the payoff on his traded-in Lincoln Zephyr was being made to the Bank.

12. To add to the ever-increasing tangle of lies, Mr. Beck signed and sent, to the Bank, a dealership check for only $1,000, which did clear (Ex. 4).

13. Not long thereafter, on July 22, 2009, the Dealership closed its doors and went out of business. All that the Bank had received on Mr. Campos' payoff, to that point, was $1,000.

14. By December 3, 2009, the Bank had repossessed and sold the Lincoln Zephyr, the collateral for its loan to Mr. Campos, leaving Mr. Campos with a deficiency obligation to the Bank of $9,946.65 (Ex. 6). That debt bore interest at the rate of $1.57 per day (Ex. 6).

15. Beginning on June 11, 2010, and ending November 22, 2010, Mr. Beck personally began remitting periodic checks to Mr. Campos' attorney, which totaled $5,200 (see Ex. 11 and Supplemental Accounting dated May 8, 2012, Adversary ECF No. 39). The last payment of this type was received on November 22, 2010.

16. The Plaintiff has also incurred taxable court costs, in the Superior Court and this court, of $711 (ECF No. 39).

17. The payments made to Mr. Campos' attorney (para. 15 above) were written on the personal account of Patrick Beck, who testified that he personally did so because "I felt like I needed to make things right."

18. Mr. Campos' treatment was not an isolated incident. Mr. Beck testified that 3-4 other people had "similar problems" as Mr. Campos, meaning that the Dealership had converted funds intended for customer payoffs for the use of the Dealership. According to Mr. Beck's testimony, "These arose in the same semester" as Mr. Campos' problem.

19. Mr. and Mrs. Beck have been married for 24 years, and are still married.

20. Mr. and Mrs. Beck filed a Chapter 7 bankruptcy on March 15, 2012.

21. The Bank is still pursuing Mr. Campos for the deficiency. Mr. Campos received a letter dated March 8, 2012 from Dennis Skarecky, the Bank's attorney, demanding a payoff of $9,946.65, but waiving interest if paid within 35 days.

## **THE LAW**

### **A. Section 523(a)(2)(A)**

Section 523(a)(2)(A) provides that:

> A discharge under section 727 ... does not discharge an individual debtor from any debt—... (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—(A) false pretenses, a false representation, or actual fraud . . . .

To support a claim of non-dischargeability under § 523(a)(2)(A), the creditor must prove, by a preponderance of the evidence, that: (1) the debtor made ... representations; (2) that at the time he knew they were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained the alleged loss and damage as the proximate result of the misrepresentations having been made. In re Sabban, 600 F.3d 1219, 1222 (9th Cir. 2010); Grogan v. Garner, 498 U.S. 279, 291 (1991) (standard of proof).

The plaintiff must make an "initial showing that the alleged 'fraud . . . existed at the time of, and has been the methodology by which, the money, property or services were obtained.'" In re Budnick, 469 B.R. 158, 2012 WL 1190650 at *10 (Bankr. D.Conn. April 9, 2012) (citation omitted).

## B. Section 523(a)(6)

Section 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

A breach of contract action without an associated tort is not the kind of injury addressed in § 523(a)(6). Lockerby v. Sierra, 535 F.3d 1038, 1041 (9th Cir. 2008).

On the other hand, an alter-ego finding based on fraud, which pierces the corporate liability shield, may give rise to a "willful and malicious injury" if the requisite intent is present. See In re Jacks, 266 B.R. 728, 741 (9th Cir. BAP 2001).

"[T]he willful injury requirement is met only when the debtor has a subjective motive to inflict injury or when the debtor believes that injury is substantially certain to result from his own conduct." In re Ormsby, 591 F.3d 1199, 1206 (9th Cir. 2010) (citing In re Su, 290 F.3d 1140, 1142 (9th Cir. 2002)). Further, "[t]he debtor is charged with the knowledge of the natural consequences of his actions." Ormsby, 591 F.3d at 1206.

The court must consider both the willful and malicious prongs. See Su, 290 F.3d at 1146-47. "'A malicious injury involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.'" Ormsby, 591 F.3d at 1207. "Malice may be inferred based on the nature of the wrongful act." Id. citing In re Littleton, 942 F.2d 551, 554 (9th Cir. 1991) (such as conversion).

This court looks to state law to determine whether an act falls within the tort of conversion, In re Jercich, 238 F.3d 1202, 1206 & n.16 (9th Cir. 2001). To prove conversion in Arizona, a party must show "an act of wrongful dominion or control over personal property in denial of or inconsistent with the rights of another." Case Corp. v. Gehrke, 208 Ariz. 140, 143, 91 P.3d 362, 365 (App. 2004) (quoting Sears Consumer Fin. Corp. v. Thunderbird Prods., 166 Ariz. 333, 335, 802 P.2d 1032, 1034 (App. 1990)).

However, a technical conversion under state law is not necessarily a "willful and malicious injury." In re Peklar, 260 F.3d 1035, 1039 (9th Cir. 2001). Federal law requires more. In Kawaauhau v. Geiger, 523 U.S. 57 (1998), the Supreme Court held that "[t]he word

'willful' in (a)(6) modifies the word 'injury,' indicating that non-dischargeability takes a deliberate or intentional *injury*, not merely a deliberate and intentional *act* that leads to injury." Id. at 61.

**APPLICATION OF THE FACTS TO THE LAW**

Mr. Beck knew his dealership was in financial difficulty when it induced Mr. Campos to trade in a vehicle and finance it through another entity. Mr. Beck knew the Dealership would convert and use Mr. Campos' new loan money for its operations, and did so. At the time of the original transaction with Mr. Campos, Mr. Beck and the Dealership knew that they had converted other customers' payoffs for use in operating the business.

The Dealership, with the knowledge and ratification of its owner, Patrick A. Beck, fraudulently misappropriated and converted Mr. Campos' funds. Mr. Beck knowingly aided that intentional misappropriation by signing a dummy check to defraud Mr. Campos into believing a remittance of $20,053.16 was being transmitted to the Bank for his benefit, when Mr. Beck instead intended to only send the Bank $1,000. This decision was part and parcel of the original sale/trade-in transaction with Mr. Campos, and thus satisfied all of the elements of fraud.

Later, after the scheme was discovered, Mr. Beck attempted to do right by Mr. Campos, and remitted personal funds to Mr. Campos' attorney to alleviate Mr. Campos' damages. These actions, while magnanimous, also implicate Mr. Beck's personal liability and complicity in the original fraud and conversion. Because of Mr. Beck's later honorable acts, a court can conclude that he knew his earlier acts were dishonorable.

Mr. Beck, at all times in the Campos' transactions, acted <u>ultra vires</u> to the Dealership, because it was not within the corporation's charter to defraud customers and convert their funds, and thus, he and his marital community are liable to Mr. Campos.

The court FINDS AND CONCLUDES that, by a preponderance of the evidence, Mr. Campos has proven a non-dischargeable liability under §§ 523(a)(2) and (6).

## DAMAGES

Patrick A. Beck and the martial community of Patrick A. Beck and Priscilla J. Beck, jointly and severally, are liable to Javier Campos for the following sums:

| | |
|---|---:|
| Principal | $ 9,946.65 |
| Interest from 12/03/09 to 11/22/10 at $1.57 per day (354 days)[1] | 555.78 |
| | $10,502.43 |
| LESS: Monies paid voluntarily by Beck | (5,200.00) |
| | $ 5,302.43 |
| Interest at .056% from 11/23/2010 to 11/22/2011 | 296.93 |
| Interest at .056% from 11/23/2011 to 05/23/2012 | 148.46 |
| Taxable costs | 711.00 |
| | $6,458.82 |

Interest will accrue on this figure at the rate of .056% per annum (non-compounding contract rate) until paid ($361.69 per year or $.9909 per day).

In addition, because under state law this matter arose out of a contractual dispute, this court concludes that Mr. Campos is also entitled to reasonable attorneys' fees. ARIZ. REV. STAT. § 12-341.01. He prayed for such in his complaint. In federal bankruptcy courts,

---

[1] From June 11, 2010 to November 22, 2010, the Becks paid Mr. Campos' attorney $5,200 towards the Campos' liability. On November 22, 2010, the sum should have been sent to the Bank to reduce Mr. Campos' liability. To the extent that was not done was not within Mr. Beck's control.

attorneys' fees can also be a part of a non-dischargeable damage claim . <u>Cohen v. de la Cruz</u>, 523 U.S. 213, 223 (1998).

Therefore, counsel for Mr. Campos shall file an affidavit supporting the prayer for fees within 15 days. Mr. Beck shall have 15 days thereafter to respond. Then the court will rule. Once ruled upon, a final judgment will issue. That judgment will be separately entered. FED. R. BANKR. P. 9021. Any appeal must be taken within 14 days after its entry on the court's docket. FED. R. BANKR. P. 8002.

DATED AND SIGNED ABOVE.

COPIES to be sent by the Bankruptcy Noticing
Center ("BNC") to all parties to this adversary proceeding